Derek R. Young, Esq., Fla. Bar No.: 45227 (PHV)
E-Mail: dyoung@kymplaw.com

KAPLAN YOUNG & MOLL PARRÓN PLLC
600 Brickell Avenue
Suite 1715
Miami, Florida 33131
Tel: (305) 531-2424
Fax: (305) 531-2405

Attorneys for Plaintiff, Mami Nutraceuticals, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| MAMI NUTRACEUTICALS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>NATIONAL MERCHANT CENTER, INC., et al.<br><br>    Defendants. | Case No.: 8:16-cv-01308-JVS-JCG<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff, Mami Nutraceuticals, LLC, sues Defendants, National Merchant Center, Inc. ("NMC") and Wells Fargo, N.A. ("Wells Fargo") (NMC and Wells Fargo, collectively, "Defendants"), for damages, as well as equitable and declaratory relief. In support, Plaintiff alleges the following:

**NATURE OF CASE**

1. From the shadows, Wells Fargo works with third party agents like NMC to provide "high risk" merchant processing services to e-commerce merchants. For years, Defendants have conspired in a deceptive scheme to surreptitiously overcharge and misappropriate sales revenue and reserve moneys from small and middle-sized e-commerce merchants, like Plaintiff, who lack any meaningful bargaining power.

2. In order to enable and further the scheme, Wells Fargo and NMC fraudulently induce merchants, as they did Plaintiff, to execute an unconscionable and adhesive services agreement, which they intentionally present piecemeal.

3. The agreement is essentially unreadable, designed to hide from the merchant and obscure onerous provisions that violate state law and public policy. The agreement provides Defendants unfettered discretion to accept, modify or terminate the agreement, while insulating them from any meaningful challenge to their unfair, deceptive and unlawful business practices.

4. This action arises out that scheme. In 2012, Defendants fraudulently induced Plaintiff to execute their unconscionable form agreement, pursuant to which Defendants agreed to process credit card transactions for Plaintiff's business on the terms disclosed to Plaintiff. They did not. Instead, Defendants breached myriad duties owed to Plaintiff by, among other things: charging and collecting undisclosed and excessive fees; failing to account for sales revenue and fees; and, without justification, reasonable notice or explanation, freezing and ultimately terminating Plaintiff's accounts.

5. Defendants refused to provide any reason for their actions. After their unilateral termination of the agreement, Defendants improperly withheld and ultimately converted to their

own use over $500,0000 of Plaintiff's sales revenue and reserve deposits. Consequently, Plaintiff was forced to suspend operations, lay off employees, and ultimately close down its business.

6. In this action, Plaintiff sues Defendants for monetary damages, as well as equitable and declaratory relief related to the enforceability of the parties' agreement and their respective rights and obligations thereunder.

## PARTIES, JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

7. Plaintiff is a Florida limited liability company with a principal place of business in Florida. Plaintiff is a citizen of Florida because each of its members is a resident of Florida.

8. NMC is a California corporation with a principal place of business in California.

9. Wells Fargo is a California corporation and national bank that is a citizen of California and South Dakota.

10. This is a suit between citizens of different States and the amount in controversy is in excess of $75,000. Pursuant to 28 U.S.C. §§ 2201 and 1332(a), this Court has subject matter jurisdiction over this suit.

11. By stipulation transferring this action from the District Court for the Middle District of Florida, the Parties agree that venue is proper in this District and that the Court has personal jurisdiction over each Party.

12. All conditions precedent to this action have been performed, waived, or otherwise satisfied.

# COMMON FACTUAL ALLEGATIONS

### *The Anatomy of a Credit Card Processing Transaction*

13. A typical retail transaction often involves a customer using a credit card to purchase goods or services from a merchant. This is almost always the case in e-commerce transactions where a customer makes the purchase through the merchant's website.

14. In addition to the customer and merchant, a credit card transaction also involves an "acquiring bank" and an "issuing bank." The issuing bank issues the customer a credit card and loans money in order to fund the purchase. The acquiring bank processes the purchase and settles the proceeds in the merchant's bank account conditionally.

15. Acquiring banks often engage agents, called independent sales organizations or merchant service providers (ISO/MSP), to originate business and manage the transaction processing and customer relationship. At all times, however, acquiring banks remain ultimately responsible for complying with the rules of the Visa and MasterCard Associations ("Association Rules").

16. For example, under the Association Rules, an acquiring bank such as Wells Fargo: (i) must be the principal (signer) to a merchant agreement; (ii) is responsible for and must provide settlement funds to the merchant; and, (iii) is responsible for all funds held in reserve that are derived from settlement.

17. The amount of money received by the merchant is less than the purchase price because the banks (and sometimes the ISO/MSP) deduct fees before the money settles in the merchant's bank account. The acquiring bank's primary fee is called a "discount rate," which is expressed as a percentage of the transaction. In addition, the acquiring bank often supplements the discount rate with additional fees, which by law must be disclosed and agreed to by the merchant prior to incurring the obligation.

18. Certain risks associated with the merchant impact the rates and fees charged to the merchant. The primary risks considered are likelihood of fraud and chargebacks from customers. And these risks vary based on the merchant's industry and the setting of the transaction.

19. Generally speaking, online merchant processing is considered riskier than brick-and-mortar merchant processing primarily due to the fact that the customer and card are not physically present at checkout, thereby increasing exposure to fraudulent transactions and chargeback and refund claims.

20. In addition to building the risk of fraud and chargebacks into the (higher) discount rate and fees, acquiring banks may require additional forms of security against chargeback and other liability in the event the merchant becomes insolvent. This is especially true for e-commerce businesses, which are sometimes required to provide personal guaranties and fund reserve accounts through the bank's withholding of a certain percentage of gross sales.

21. Despite the ostensible increased risk posed by e-commerce merchants, e-commerce processing is much more profitable for banks than low risk brick-and-mortar transactions. And because of this, the industry has become a breeding ground for predatory parties, like Defendants here, looking to capitalize on their dominant bargaining power and merchants' lack of meaningful choice.

### *The Processing Agreement*

22. Until Defendants put it out of business, Plaintiff ran an e-commerce business that marketed and sold nutritional products online.

23. In order to operate its business, Plaintiff, like any other business that offers products for sale online, relied on a merchant processing bank to facilitate credit card transactions online.

24. In 2012, one of Defendants' referral agents introduced Plaintiff to NMC, which through the referral agent provided Plaintiff a "Merchant Processing Application And Agreement" (the "Application/Agreement"). On the signature page of the Application/Agreement, in fine print, the Application/Agreement references NMC "Program Guide" (Application/Agreement and Program Guide, together, the "Agreement").

25. The manner in which the Application/Agreement and referenced Program Guide were presented confused Plaintiff. Although a link to the Program Guide is referenced in the fine print and the confirmation of receipt was provided along with the Application/Agreement, Plaintiff did not receive a copy or read the Program Guide prior to completing the Application/Agreement on October 19, 2012.

26. At the time and under the circumstances in which the Application/Agreement was presented, Plaintiff did not believe that by signing the Application/Agreement it was entering into a binding agreement. Plaintiff believed that the Application/Agreement was, in fact, an application for purposes of Defendants' underwriting. And, in fact, no agreement was formed because the Application/Agreement expressly states that the NMC and the Bank had neither approved Plaintiff nor consented to the Agreement.

27. At the time and under the circumstances in which the Application/Agreement was presented, Plaintiff presumed that the Application/Agreement set forth the material terms of the application and potential final agreement, and that the Program Guide was, as it appears, a very lengthy and confusing technical guide to the payment processing relationship.

28. Both the Application/Agreement and the Program Guide are standardized documents drafted by counter-parties with vastly superior bargaining strength. Plaintiff later attempted to read through but did not understand the substance or legal import of the Program

Guide, which is 26 pages in length, formatted in small print and double columns, and written in technical and lawyerly prose that Plaintiff could not understand.

29. Defendants intentionally drafted and formatted the prolix printed form Program Guide in a way that would make it unreadable to an unsophisticated merchant and would obscure or hide the terms upon which they further their scheme, including those related to fees and reserves, termination rights, discretion, limitations of liability, commingling of funds, and other material matters.

30. The terms set forth in the Program Guide do not align with the reasonable expectations of Plaintiff at the time it signed the Application/Agreement or anytime thereafter. Many of the terms buried within the dense blocks of text are intentionally ambiguous in order to provide Defendants even greater latitude to exercise arbitrarily exercise their discretion in bad faith and administer the contract unfairly and with impunity.

31. For example, under section 18.3, Defendants, *without notice*, may unilaterally increase the discount rate and transactional fees if Plaintiff's actual transaction volume or average transaction size is not as "expected." But there is no standard by which to ascertain what the Defendants' expected those thresholds to be at the time of contract.

32. Under section 18.5, Defendants may unilaterally increase their fees for *any reason* with 20 days' notice.

33. Under section 23.2, Defendants may terminate the Agreement at any time and for any reason by providing 30 days' advance notice. Upon an "Event of Default," they may terminate the Agreement with shorter notice or immediately. The "Events of Default" are defined in absurdly broad terms and include patently ambiguous standards, including, for example: "irregular card sales by you, excessive chargebacks…or any other circumstances which, in

[Defendants'] sole discretion, may increase their exposure for [Plaintiff's] chargebacks or otherwise present a financial risk or security risk to them."

34. The Program Guide also includes separate liquidated damages and early termination provisions, although in substance both purport to provide Defendants an arbitrary right to liquidated damages. The provisions are inconsistent, impossible to reconcile and fatally ambiguous. The liquidated damages amount is described as a "pre-estimate of Servicers' probable loss," but an actual amount is not included. Both provisions constitute penalties and were unreasonable under the circumstances existing at the time the Agreement was made.

35. The Program Guide is devoid of standards fencing-in the Defendants' exercise of discretion in determining an Event of Default. There is no objective measure of what constitutes "irregular card sales" or a list of factors to be considered by Defendants in determining the risk of increased exposure for chargebacks.

36. The Application/Agreement and Program Guide relegate Plaintiff only the opportunity to adhere to or reject them. Both the Preface to and the Confirmation Page of the Program Guide's Confirmation Page state: NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED AND, IF MADE, ANY SUCH ALTERATIONS OR STRIKE-OUTS SHALL NOT APPLY.

### *Defendants Breach Their Duties and Destroy Plaintiff's Business*

37. Despite never receiving clarity on the contours or scope of the contractual relationship, Defendants began processing for Plaintiff at the end of 2012.

38. At all material times, Plaintiff marketed and sold its products legally and responsibly as evidenced by its low chargeback and refund rates.

39. Though Plaintiff processed without incident during a period of time where its chargeback and refund rates were squarely within acceptable ranges, Defendants breached their duties under the Agreement by, among other things, freezing and then ultimately terminating Plaintiff's processing accounts – prior to which, Defendants failed to provide statements, an accounting or an invoice regarding debits or credits to the Settlement Account, including any debits for deficiencies, overages, fees and chargebacks, as required under section 18.9 of the Agreement.

40. Plaintiff made several demands on Defendants to provide an explanation for the freeze and termination, but Defendants equivocated.

41. Plaintiff made several demands for an accounting in order to determine the amount of money being held in Plaintiff's accounts or in reserve. Defendants refused.

42. Finally, after Defendants' absolute refusal to provide Plaintiff with information regarding its accounts and reserves, Plaintiff declared Defendants in breach and made several demands for return of its property, including serving Defendants with a civil theft demand pursuant to Florida Statute section 772.11. Consistent with their pattern of misconduct, Defendants once again refused and did not comply with the civil theft demand within 30 days of service.

### *Defendants Have Destroyed Plaintiff's Business*

43. Defendants intentionally put Plaintiff – a small, vulnerable merchant – in the dark, cutting off its processing capability without any concrete explanation for doing so.

44. As a result of the freeze and ultimate termination of the accounts, Defendant lost significant revenue, forcing it to lay off almost its entire staff and ultimately shut down operations.

45. As a result of Defendants' refusal to account for or release Plaintiff's money (in whole or in part), Plaintiff was incapable of meeting payroll, purchasing media to advertise its products, or otherwise meeting its obligations to other vendors to which it is obligated.

46. With malice, oppression and fraud, Defendants engaged in conduct that harmed Plaintiff and directly destroyed its business, knowing that they were the exclusive provider of merchant processing "Services" pursuant to section 17 of the Agreement.

47. After the filing of this lawsuit, Wells Fargo made the incredible claim that it was not a party to the Agreement and attempted to hinder, delay or defraud Plaintiff by transferring its property to NMC. And by doing so, Wells Fargo violated both California Civil Code section 3439 et seq., among other laws, and the Association Rules, including VISA's Rule requiring acquirers to hold and control merchant reserves and MasterCard's Rules prohibiting ISOs like NMC from having access to funds then or subsequently due to a merchant or funds withheld as reserves.

## COUNT I
## DECLARATORY JUDGMENT AND EQUITABLE ACCOUNTING

48. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

49. Under the facts alleged herein, there is a substantial controversy, between the Parties, which have adverse legal interests, regarding the enforceability of the Agreement and the Merchant's right to the sales revenue and reserve moneys withheld by Defendants.

50. Plaintiff contends that the Agreement is not enforceable because it is illusory, unconscionable, lacks mutuality of obligation, violated public policy, and confers on Defendants an unfettered or arbitrary right to modify or terminate the Agreement. The Agreement, drafted by

Defendants, has as its object, directly or indirectly, to exempt Defendants from responsibility for their own fraud, willful injury to the property of another, or violation of law.

51. Plaintiff further contends that certain provisions in the Agreement are unenforceable under prevailing law, including the default, exculpatory, limitation of liability, liquidated damages, early termination fee an reserve account provisions.

52. Finally, Plaintiff contends that it is entitled to immediate possession of its property withheld by Defendants under the Agreement or the law, including California Civil Code section 1671.

53. These disputes are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

54. Defendants' absolute refusal to communicate a concrete justification for their action and inaction or otherwise advise Plaintiff of its rights to its own property require this Court to issue a declaration of those rights.

55. The relationship between the parties involved extensive and complicated accounts to which Defendants repeatedly denied Plaintiff access.

56. It is unclear that the remedy available at law is as full, adequate, and expeditious as it is in equity.

WHEREFORE, Plaintiff requests this Court to enter judgment declaring the Agreement or portions of it void or, alternatively, the parties' rights under the Agreement, including Plaintiff's right to immediate release of all sales revenue and reserve funds, in addition to ordering a full accounting of Plaintiff's accounts with Defendants, including balances, debits, credits, chargebacks and refunds, together with such other relief this Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT

57. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

58. Plaintiff entered into the Agreement with Defendants and did all, or substantially all, of the significant things the Agreement required it to do or was excused from having to do those things.

59. Under the Agreement, Plaintiff was entitled to receive all reserve funds and the proceeds from card payments, minus certain handling and transaction fees and less any chargebacks and disputed payments.

60. Defendants breached the Agreement by, among other things: failing to provide the Services as set forth in the Agreement; failing to account for and provide settlement funds to Plaintiff; failing to promptly initiate transfers of settlement funds to Plaintiff after presentment; failing to process and transfer funds from transactions within two business days from receipt of a batch; debiting Plaintiff's account without legal authorization; freezing and terminating Plaintiff's accounts and the Agreement; failing to provide material information to Plaintiff, including account balances and reasons for their actions; refusing to release Plaintiff's money being held in its accounts and reserves; failing to request that Plaintiff pay an amount sufficient to cover chargebacks, adjustments, fees and other charges purportedly due; and, transferring Plaintiff's money to a party not authorized under the Agreement.

61. As a direct and proximate cause of Defendants' myriad breaches of the Agreement, Plaintiff has suffered significant and continuing damages.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendants, jointly and severally, awarding damages to Plaintiff, together with attorneys' fees, costs and such other relief this Court deems just and proper.

## COUNT III
## CONVERSION

62. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

63. Defendants committed several wrongful acts, including but not limited to: failing to provide Plaintiff access to its accounts; failing to properly account for Plaintiff's property; refusing to provide Plaintiff information regarding its accounts; and, failing to distribute to Plaintiff its property.

64. Defendants' contractual right, if any, to withhold Plaintiff's processing revenue and reserve funds expired.

65. Plaintiff owned or had a right to possess the processing revenue and reserve funds, which is a specifically identifiable sum Defendants accepted to be paid to Plaintiff. Defendants' had a common law duty to return Plaintiff's property on demand.

66. Defendants intentionally and substantially interfered with Plaintiff's property by preventing Plaintiff from having access to the property and refusing to turn it over on demand.

67. Plaintiff did not consent to Defendants' actions.

68. Defendants' wrongful acts have, either permanently or indefinitely, caused damage to Plaintiff by depriving it of its property.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendants, jointly and severally, awarding damages to Plaintiff, together with such other relief this Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

69. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

70. The Agreement imposed upon Defendants a duty of good faith and fair dealing in its performance and its enforcement, which includes among other things a duty to refrain from exercising discretion or taking unilateral action under the Agreement in an arbitrary way.

71. Plaintiff did all, or substantially all, of the significant things the Agreement required it to do or was excused from having to do those things.

72. Defendants unfairly interfered with Plaintiff's right to receive the benefits of the Agreement, including the receipt of the reserve funds and all processing revenue minus certain handling and transaction fees and less any chargebacks and disputed payments, by among other things: exercising its discretion in an arbitrary and unfair manner; freezing Plaintiff's accounts without any notice or communication; terminating the Agreement without any notice, explanation or communication; refusing to provide an accounting or an invoice regarding debits or credits to the Settlement Account and reserve accounts; violating or attempting to circumvent Association Rules in order to deprive Plaintiff of the benefit of its bargain and right to its property; failing to adequately or in good faith perform an investigation prior to terminating the Agreement; and, failing to request that Plaintiff pay additional moneys into the Reserve Account sufficient to cover chargebacks, adjustments and other charges due prior to terminating the Agreement.

73. Plaintiff was harmed by Defendants' conduct.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendants, jointly and severally, awarding damages to Plaintiff, together with such other relief this Court deems just and proper.

## COUNT V
## UNFAIR COMPETITON

74. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

75. Due to Defendants' unlawful, unfair and fraudulent business acts and practices or from the resulting unfair competition, Plaintiff has lost money.

76. Defendants' business practices are forbidden by law and constitute violations of California public policy and prevailing law, including but not limited to California Civil Code sections 1671, 1668 and 3439 et seq.; intentional conversion of Plaintiff's property; use of unconscionable contracting practices to deceive and defraud customers and insulate themselves from liability for their unlawful, unfair and fraudulent practices.

77. The Agreement imposed upon Defendants a duty of good faith and fair dealing in its performance and its enforcement.

78. Plaintiff did all, or substantially all, of the significant things the Agreement required it to do or was excused from having to do those things.

79. Defendants unfairly interfered with Plaintiff's right to receive the benefits of the Agreement, including the receipt of the reserve funds and all processing revenue minus certain handling and transaction fees and less any chargebacks and disputed payments, by among other things: exercising its discretion in an arbitrary and unfair manner; freezing Plaintiff's accounts

without any notice or communication; terminating the Agreement without any notice, explanation or communication; refusing to provide an accounting or an invoice regarding debits or credits to the Settlement Account and reserve accounts; violating or attempting to circumvent Association Rules in order to deprive Plaintiff of the benefit of its bargain and right to its property; failing to adequately or in good faith perform an investigation prior to terminating the Agreement; and, failing to request that Plaintiff pay additional moneys into the Reserve Account sufficient to cover chargebacks, adjustments and other charges due prior to terminating the Agreement.

80. The predominate effect of Defendants' "Termination Fee" was not to provide Plaintiff with a choice of whether to keep the Agreement or terminate it. Nor was the predominate effect to act as a reasonable liquidated damages provision. Instead, Defendants used their arbitrary discretion and unconscionable power to force Plaintiff to pay the fee after they unilaterally decided to terminate the Agreement in order to procure a windfall. The Termination Fee, therefore, had the invidious characteristic of a penalty or forfeiture.

81. Plaintiff was harmed by Defendants' conduct.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendants, jointly and severally, awarding damages and injunctive relief to Plaintiff, together attorneys' fees, costs and such other relief this Court deems just and proper.

**COUNT VI**
**RECOVERY OF VOID LIQUIDATED DAMAGES (Cal. Civ. Code section 1671)**

82. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

83. The Agreement's liquidated damages provisions are unreasonable under the circumstances existing at the time the Agreement was made.

84. The liquidated damages provisions purport to fix Plaintiff's liability without any reference to actual damages sustained, and Defendants application of the liquidated damages provisions acts as a penalty because the amount withheld from Plaintiff is disproportionate to the anticipated penalties. The provisions are therefore ineffective and unenforceable.

85. Plaintiff has been harmed by the application of the liquidated damages penalty and is entitled to actual damages sustained, including all moneys withheld by Defendants as liquidated damages under the Agreement.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendants, jointly and severally, awarding damages to Plaintiff, together with such other relief this Court deems just and proper.

### COUNT VII
### CIVIL THEFT (Fla. Stat. section 812.019)

86. Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-47 as if fully set forth herein.

87. In 2013, Plaintiff served Defendants with a civil theft demand pursuant to Florida Statute section 772.11, wherein Plaintiff demanded that Defendants remit within 30 days the treble damage amount. Defendants failed to comply with the demand, causing damage to Plaintiff.

88. Defendants unjustifiable and arbitrary refusal to release to Plaintiff the reserve funds and Defendants ultimate conversion of that property constitutes theft under Florida law, including Florida Statute section 812.019.

89. Defendants knowingly obtained or used, or endeavored to obtain or use, Plaintiff's property with felonious intent either temporarily or permanently to deprive Plaintiff of

its right to or a benefit from the property or to appropriate the property to Defendants' own use or to the use of a person not entitled to the property.

90. Specifically, Defendants knowingly and with felonious intent converted money received from or on behalf of Plaintiff's customers to their own use.

91. After terminating the Agreement, moreover, Defendants worked together with felonious intent to conceal their theft of Plaintiff's property.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendants, jointly and severally, awarding treble damages to Plaintiff, as well as attorneys fees, costs and such other relief this Court deems just and proper.

Respectfully submitted,

**KAPLAN YOUNG & MOLL PARRÓN PLLC**
*Attorneys for Plaintiff, Mami Nutraceuticals, LLC*
Brickell World Plaza
600 Brickell Avenue
Suite 1715
Miami, Florida 33131
Tel: (305) 531-2424
Fax: (305) 531-2405

By:    */s/ Derek R. Young*
Derek R. Young, Esq.
Fla. Bar No.: 45227
*dyoung@kymplaw.com*

**PROOF OF SERVICE**

Pursuant to L.R. 5-3.2.1, I hereby certify that a true and accurate copy of the above and foregoing has been furnished to those parties registered to receive service via CM/ECF, on this 28th day of March, 2017.

*/s/ Derek R. Young*
Derek R. Young, Esq.